## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Swift & Co.,                                             Civil No. 05-2775 (PAM/JJG)

               Plaintiff,

v.                                                      **MEMORANDUM AND ORDER**

Elias Farms,

               Defendant.

_____

Swift & Co.,                                             Civil No. 05-2776 (PAM/JJG)

               Plaintiff,

v.

Stan Turbes,

               Defendant.

_____

Swift & Co.,                                             Civil No. 05-2777 (PAM/JJG)

               Plaintiff,

v.

William H. Johnson,

               Defendant.

_____

This matter is before the Court on cross-Motions for Summary Judgment.  For the reasons that follow, the Court grants in part and denies in part all Motions.

**BACKGROUND**

**A.    The Parties**

Plaintiff Swift & Co. is a Delaware corporation with its principal place of business in Colorado.  Its primary business is beef and pork processing.  Defendant Elias Farms, Inc. is a Minnesota corporation engaged in the business of raising hogs in Adrian, Minnesota. Defendant Stan Turbes operates a hog production farm in Hanska, Minnesota.  Defendant William Johnson operates a hog production farm in Comfrey, Minnesota.

**B.    The Original Hog Purchase Contracts**

On January 1, 1998, Swift and Defendants entered into separate, but nearly identical, Hog Purchase Contracts ("Contracts") under which Defendants were required to supply varying numbers of hogs to Swift.

1.    <u>Pricing Provisions</u>

Article 6 of the Contracts, which described how the price of the hogs would be calculated, linked the price to United States Department of Agriculture (USDA) price reports. In particular, Section 6.01 explained that the price equaled the "Base Price" plus or minus an adjustment based on the percentage of meat to fat in the hog carcass.  The "Base Price"

was based on the "Market Price" set by the USDA's daily market news service live weight report for hogs.[1]  (Corey-Edstrom Aff. Exs. 1-3 § 6.01.)

Section 6.02 set the Base Price floor at $40.00 per hundred pounds of live animal weight and the ceiling at $45.00 per hundred pounds of live animal weight.  Thus, if the Market Price for hogs was between $40.00 and $45.00 per hundred pounds of live animal weight, Swift would pay Defendants that Base Price.  If the Market Price was lower than $40.00, Swift paid the Base Price of $40.00 per hundred pounds of live animal weight and debited an adjustment account "by the amount equal to the live cwt.[2] of Market Hogs delivered on that date multiplied by the amount by which $40.00 exceeds the Market Price on such date."  (Id. § 6.02.)  If the Market Price exceeded $45.00 and if there was a debit balance in the adjustment account, Swift would pay the Base Price of $45.00 but would credit the adjustment account "by an amount (not to exceed the then existing debit balance in the Adjustment Account) equal to the product of . . . the live cwt. of Market Hogs delivered on such date, multiplied by . . . the 'Price Adjustment.'"[3]  (Id.)

---

[1]  Section 6.01 also provided that the base price would be determined by the USDA's live weight report "or any replacement thereof or successor thereto." (Corey-Edstrom Aff. Exs. 1-3 § 6.01.)

[2]  "Cwt." is an abbreviation for one hundred pounds of live animal weight.

[3]  The Price Adjustment varied depending on the Market Price.  If the Market Price fell between $45.00 and $47.99, the Price Adjustment equaled $0.50.  If the Market Price equaled $48.00 or greater, the Price Adjustment equaled $1.00.

3

Finally, Section 6.02 provided: "If, at the termination of this Agreement, there is a debit balance in the Adjustment Account," the hog producer would be required to pay Swift a cash amount equal to the debit balance. (Id.)

    2.    <u>Termination Provisions</u>

The Contracts were to "continue and remain in full force and effect through December 31, 2004, unless otherwise extended by the parties hereto or unless terminated in accordance with the terms hereof." (<u>Id.</u> § 1.01.)  Article 9 of the Contracts provided that either party could terminate the Contracts by providing written notice to the other party if the other party defaulted.  (<u>Id.</u> §§ 9.03-.04.)  A default occurred when: (1) a party failed to perform its contractual obligation and failed to cure the default within ninety days following receipt of written notice of the default from the other party; (2) a party was adjudged bankrupt; (3) a party made an assignment for the benefit of its creditors or ceased to carry on business; or (4) a party appointed a receiver or trustee for its business or affairs.  (<u>Id.</u> §§ 9.01-.02.)

    3.    <u>Choice of Law Provision</u>

Section 16.03 of the Contracts provided:

Seller and Buyer shall use their best efforts to settle any dispute, claim, question or disagreement arising out of or relating to this Contract or any alleged breach of this Contract. This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of Nebraska applicable to contracts made and performed in Nebraska. Any and all disputes arising between the parties in respect to this Agreement shall be brought in the state or federal courts located in Nebraska. The parties submit to the jurisdiction of, and do hereby agree to voluntarily appear in such court.

(<u>Id.</u> at § 16.03.)

4

**C.      Price Modifications to the Contracts**

During the 1998-2004 term of the Contracts, Swift changed how the Base Price would be calculated.  Defendants contend that the changes resulted in Swift paying Defendants less than what the original Contracts required.

1.      1999 Modification to the Base Price Calculation

On March 1, 1999, the USDA changed its price reporting system.  The new report system changed from live weight price reporting to carcass weight price reporting.  Because the USDA's live weight price report was no longer available, Swift determined that it needed to modify the pricing provisions of the Contracts.

On February 27, 1999, Swift notified Defendants that it was modifying Article 6 of the Contracts to change the method by which it calculated Market Price.  (Corey-Edstrom Aff. Exs. 12-14.)  The modification linked the Base Price to the USDA daily market report for the weighted average carcass price and established a price range of $54.05 to $60.81.  Thus, if the Market Price was less than $54.05 carcass weight, Swift would pay a Base Price of $54.05 per hog but would debit the adjustment account by an amount equal to the carcass weight of the hogs multiplied by the amount by which $54.05 exceeded the Market Price.  If the Market Price exceeded $60.81 and there existed a debit balance in the adjustment account, Swift would decrease the Base Price and credit the adjustment account "by an amount (not to exceed the then existing debit balance in the Adjustment Account) equal to the product of (i) the carcass cwt. of Market Hogs delivered on such date, multiplied by

(ii) the 'Price Adjustment.'"[4]   The letters explaining the modifications reiterated that if a debit balance existed in the adjustment account at the termination of the Contracts, then the hog producer was required to pay Swift a cash amount equal to the debit balance.

    2.    <u>2000 Modifications</u>

Swift made two more changes to the pricing provisions in 2000.  In January 2000, Swift notified Defendants that it would temporarily add $0.40 per hundred pounds of carcass weight to the Market Price effective January 24, 2000.  (Corey-Edstrom Aff. Exs. 16-18.) In July 2000, Swift proposed that Market Price would be calculated as the average of:

(a)    Weighted average carcass price for the Base Market Hog, 49-51% Lean . . . , reported by the USDA Market News Service at mid-season the day of delivery (the "Weighted Average Price"), and

(b)    The highest reported price in the range of prices comprising the Weighted Average Price.

(Corey-Edstrom Aff. Exs. 20-22.)   Each Defendant agreed in writing to the July 2000 modification.

Swift has submitted an economic analysis report completed by Marvin L. Hayenga. Hayenga opined that Swift "made reasonable efforts to take changes in government reporting and industry practices into account, even though all of those had not been anticipated and built into the original contract."  (Corey-Edstrom Aff. Ex. 33 at 9.)  He further concluded that the 1999 modification, which converted live weight prices to carcass weight prices, resulted in prices that were at least equal to or higher than the prices for Defendants than would have

---

[4] The Price Adjustment varied depending on the Market Price.  If the Market Price fell between $60.81 and $64.85, the Price Adjustment equaled $0.68.  If the Market Price equaled $64.86 or greater, the Price Adjustment equaled $1.35.

been the case with the live weight prices defined by the original Contracts.  (Id. at 9-10.)

Finally, he concluded that the modifications in 2000 likely resulted in higher prices to

Defendants than what the original Contracts called for.  (Id.)  He summarized:

> In my professional opinion, despite the impossibility of a clear statistical
> comparison of the old and new pricing systems, it is highly like the Swift
> changes in the pricing system (required due to the loss of the USDA report
> specified in the contract) led to higher prices, and not to any economic loss, to
> Defendants over the life of these Contracts.

(Id. at 10 (emphasis in original).)

## D.      Demand for Payment of Adjustment Account Balances

Each Contract ended on December 31, 2004.  On January 3, 2005, Swift demanded

that each Defendant pay the balance in their adjustment accounts.  The adjustment account

for Defendant Elias Farms equaled $265,489.18.  The adjustment account for Defendant

Turbes equaled $434,727.00.   The adjustment account for Defendant Johnson equaled

$244,187.00.   Defendants disputed the balances and refused to pay, causing Swift to

commence these actions.

## DISCUSSION

Swift asserts three claims against each Defendant: breach of contract, unjust

enrichment, and account stated.  Defendants deny liability and contend that the modifications

that Swift made to the Contracts resulted in payments lower than required by the initial

Contracts.  They counterclaim for breach of contract, violation of the Minnesota Prevention

of Consumer Fraud Act, and unjust enrichment.

Defendants move for summary judgment on all of Swift's claims, as well as their breach of contract and fraud counterclaims. Swift seeks summary judgment on its breach of contract claims and on all of Defendants' counterclaims.

## A.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. <u>Id.</u> The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. <u>Enter. Bank v. Magna Bank</u>, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. <u>Enter. Bank</u>, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

## B.    Swift's Breach of Contract Claims

Swift alleges that Defendants breached the Contracts by failing to pay the adjustment account balances. The parties have filed cross-motions on Swift's breach of contract claims. Defendants advance three arguments in support of dismissing the claims. First, they argue

8

that the Contracts are void under Minnesota law because they do not contain mediation or arbitration provisions.  Second, they argue that the Contracts are contracts of adhesion and are unconscionable.  Third, they argue that Swift's breach of contract claims fail because Swift failed to terminate the Contracts before the Contracts expired.

1.     Lack of Arbitration or Mediation Provisions in the Contracts

Defendants argue that the Contracts are void because they fail to contain mediation or arbitration provisions, as required by Minnesota Statute § 17.91, which provides:

> A contract for an agricultural commodity between a contractor and a producer must contain language providing for resolution of contract disputes by either mediation or arbitration.  If there is a contract dispute, either may make a written request to the commissioner for mediation or arbitration services as specified in the contract, to facilitate resolution of the dispute.

Nebraska law has no such requirement.  Thus, the first issue relating to this defense is whether Nebraska or Minnesota law applies.  If the Court determines that Minnesota law applies, the second issue is whether the Contracts are void under Minnesota law because they do not contain the provisions.

a.     Choice of Law

The parties dispute whether Nebraska or Minnesota substantive law applies.  Although Swift ignored part of Section 16.03 that required it to bring its actions in a Nebraska court, it now relies on the part of Section 16.03 that requires all contractual disputes to be "governed by and construed in accordance with the laws of the State of Nebraska applicable to contracts made and performed in Nebraska."  (Corey-Edstrom Aff. Exs. 1-3 § 16.03.)

Defendants argue that application of Nebraska law would be unconstitutional because

no party has a connection to Nebraska and because all events relating to the Contracts occurred in Minnesota.  They also argue that Minnesota Statute § 336.1-501 requires that there be a "reasonable relation" between the transaction and state before the choice-of-law provisions in a contract will be enforced.

As a federal court sitting in diversity, the Court must apply Minnesota law, including Minnesota's choice-of-law rules, to the breach of contract claims.  Schwan's Sales Enters., Inc. v. SIG Pack, Inc., 476 F.3d 594, 595-96 (8th Cir. 2007).  Minnesota courts generally recognize and apply choice-of-law clauses in contracts requiring the application of a foreign state's law.  See id. at 596 (citing Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980)).  The choice-of-law provisions in the Contracts require the application of Nebraska law to disputes arising under the Contracts.

However, even when a general choice-of-law provision exists in a contract, Minnesota courts apply Minnesota law regarding matters of procedure and remedies.  Id. (citing U.S. Leasing v. Biba Info. Processing Servs., Inc., 436 N.W.2d 823, 825-26 (Minn. Ct. App. 1989)); see also Danielson v. Nat'l Supply Co., 670 N.W.2d 1, 5 (Minn. Ct. App. 2003) ("Traditionally when a conflict-of-law issue arises, the preliminary step is to decide whether the question is substantive or procedural.").  Indeed, Minnesota courts generally apply their own state's procedure and remedies in all cases involving conflicts of laws, whether the parties have a choice-of-law agreement or not.  Schwan's Sales Enters., Inc., 476 F.3d at 596 (citing Davis v. Furlong, 328 N.W.2d 150, 153 (Minn. 1983)); see also Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir. 1995) (the first question is whether the law at issue is

10

procedural or substantive; if the law is procedural, the court applies the law of the forum state); Zaretsky v. Molecular Biosys., Inc., 464 N.W.2d 546, 548 (Minn. Ct. App. 1990) ("In Minnesota, the well-settled rule is that matters of procedure and remedies are governed by the law of the forum.").  If the parties wish for the application of another state's law concerning procedural and remedial matters, they must expressly state it in their agreement. Schwan's Sales Enters., Inc., 476 F.3d at 596 (citing U.S. Leasing, 436 N.W.2d at 826).

Thus, the issue is whether § 17.91 is procedural or substantive.  Minnesota law governs this determination.  Nesladek, 46 F.3d at 736; Zaretsky, 464 N.W.2d at 548.  The Minnesota Supreme Court has not addressed whether § 17.91 is procedural or substantive. However, it has defined substantive law as "that part of law which creates, defines, and regulates rights," as opposed to procedural or remedial law, "which prescribes method of enforcing the rights or obtaining redress for their invasion."  Meagher v. Kavli, 88 N.W.2d 871, 879-80 (Minn. 1958).

Section 17.91 requires parties to resolve their contract disputes by either mediation or arbitration.  As such, it defines how the parties will enforce their substantive rights under the contract.  The law does not determine the outcome of a contract dispute—it defines where the dispute will be resolved.  Thus, the Court finds § 17.91 applies to the case at hand.

b.      Whether the Contracts Are Void

Because the Court finds that § 17.91 applies, the Court must determine whether the Contracts are void because they do not contain mediation or arbitration provisions.  Entering a contract in violation of a statute does not void the contract per se.  Isles Wellness, Inc. v.

11

Progressive N. Ins. Co., 725 N.W.2d 90, 92-93 (Minn. 2006). Rather, the Court must examine the Contracts to determine whether the illegality has "so tainted the transaction" that enforcement of the Contracts would violate public policy. Id. Generally, "a contract is not void as against public policy unless it is injurious to the interests of the public or contravenes some established interest of society." Id.

Categorically voiding the Contracts would not serve public policy. There is no indication that the legislature intended that a violation of § 17.91 should void a contract. Moreover, allowing a party to avoid their contractual obligations does little to promote the efficiency of litigation or the interests of justice. Finally, the record does not demonstrate that the parties knowingly and intentionally failed to abide by Minnesota law or that illegality permeated the transaction. Thus, the violation of § 17.91 does not void the Contracts. Defendants' argument on this point fails.

2.   Whether the Contracts Are Unconscionable or Contracts of Adhesion

Defendants argue that the Contracts are void because they are contracts of adhesion and unconscionable. A contract of adhesion is one "drafted unilaterally by the business enterprise and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere." Vierkant by Johnson v. AMCO Ins. Co., 543 N.W.2d 117, 120 (Minn. Ct. App. 1996) (quoting Schlobohm v. Spa Petite, Inc., 326 N.W.2d 920, 924 (Minn. 1982)). A contract is unconscionable if it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." Id. (citations omitted).

The record does not support Defendants' contentions.  Swift provided Defendants a copy of the Contracts several days to weeks before Defendants signed the Contracts.  Indeed, William Elias, the majority shareholder of Defendant Elias Farms, had an attorney review his Contract.  Moreover, Defendants were longtime hog producers who had specialized knowledge of the industry—including knowledge of the hog markets and Swift's competitors.  Defendants had an opportunity to request changes in the Contracts, turn to one of Swift's competitors, or rely on the market for their prices.

Notably, a similar unfairness and adhesion argument was rejected in <u>Schoenrock v. John Morrell & Co., Inc.</u>, Nos. 03-848, 03-849, 03-853, 03-854, 2003 WL 21639161, at *4 (D. Minn. 2003) (Tunheim, J.).  In that case, the hog producers argued that the contract was presented as "take it or leave it" and that the unsophisticated hog producers could not negotiate certain provisions.  The court emphasized that there was no evidence that the hog producers attempted to negotiate the provisions or of bad faith.  The same is true here.  Defendants' argument on this point fails.

3.      <u>Whether Defendants Breached the Contracts</u>

The crux of Swift's breach of contract claim involves interpretation of Section 6.02 of the Contracts, which states: "If, <u>at the termination of this Agreement</u>, there is a debit balance remaining in the Adjustment Account, Seller shall pay to Buyer a cash amount equal to such debit balance."  (Corey-Edstrom Aff. Exs. 1-3 § 6.02 (emphasis added).)  Swift argues that Section 6.02 requires Defendants to pay Swift the balance due under the adjustment accounts at termination of the Contracts—whether that termination was due to

a lapse in time or an affirmative act by a party.  Defendants argue that termination could only occur by the affirmative act of a party—and not by the mere lapse in time.

        a.    <u>Choice of Law</u>

As an initial matter, a choice-of-law determination is made on an issue-by-issue basis. <u>Zaretsky</u>, 464 N.W.2d at 548.  Thus, although Minnesota law applies to the issue of whether the Contracts were void, it does not follow that Minnesota law will necessarily apply to the substantive breach of contract claim.  <u>Id.</u>  To determine whether a choice of law is necessary, the Court must first determine whether there is an actual conflict between the substantive law of the states.  <u>Jepson v. Gen. Cas. Co.</u>, 513 N.W.2d 467, 469 (Minn. 1994). Where choosing one state's law is "outcome determinative," an actual conflict of law exists.  <u>Id.</u>

Minnesota and Nebraska courts apply the same general rules of contract interpretation. <u>Cf., e.g.</u>, <u>Carl Bolander & Sons, Inc. v. United Stockyards Corp.</u>, 215 N.W.2d 473, 476 (Minn. 1974) ("Where the language used in a contract is plain and unambiguous, there is no opportunity for interpretation of construction"), <u>with</u> <u>Gast v. Peters</u>, 671 N.W.2d 758, 763 (Neb. 2003) ("When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as to the ordinary or reasonable person would understand them.").  Because no conflict of law exists, there is no choice-of-law issue and the Court will apply Minnesota law to Swift's breach of contract claims.  <u>Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.</u>, 356 F.3d 850, 854 (8th Cir. 2004) (citing <u>Vetter v. Sec. Cont'l Ins. Co.</u>, 567 N.W.2d 516, 521-22 (Minn. 1997)).

b.    Contract Interpretation

The primary goal of contract interpretation is to determine and enforce the intent of

the parties.  Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323

(Minn. 2003).  Where there is a written agreement, the intent of the parties is determined

from the plain language of the agreement itself.  Metro. Sports Facilities Comm'n v. Gen.

Mills, 470 N.W.2d 118, 123 (Minn. 1991).  The Court must construe the contract as a whole

and give every part effect.  Country Club Oil Co. v. Lee, 58 N.W.2d 247, 249 (Minn. 1953)

("It is an elementary principle of law that a contract must be construed as a whole.  The

intention of the parties must be gathered from the entire instrument and not from isolated

clauses.  As far as is reasonably possible it is to be construed so as to harmonize all of its

parts.").

Whether a contract is ambiguous is a question of law.  Blackburn, Nickels, & Smith,

Inc. v. Erickson, 366 N.W.2d 640, 643 (Minn. Ct. App. 1985).  An ambiguous contract is one

that, based solely on the plain language, is reasonably susceptible of more than one

construction.  Hous. & Redev. Auth. of Chisholm v. Norman, 696 N.W.2d 329, 337 (Minn.

2005).  If the contract language is ambiguous, the interpretation of the contract becomes a

question of fact and extrinsic evidence may be considered to determine the intent of the

parties.  Id.; Trondson v. Janikula, 458 N.W.2d 679, 681 (Minn. 1990).

The Court recognizes that the ordinary definition of "termination" includes an ending

by an affirmative act as well as by a lapse in time.  For example, Black's Law Dictionary

defines "termination" as "(1) the act of ending something; extinguishment . . . ; (2) the end

15

of something in time or existence; conclusion or discontinuance." Black's Law Dictionary 1511 (8th ed. 2006); see also Webster's Third New Int'l Dictionary 2359 (1986) (defining "termination" as "the act of determining" or "end in time or existence").

However, the plain and clear language of the Contracts, read as a whole and providing full effect to all provisions, limits "termination" to an affirmative act by a party, precipitated by the other party's default. Section 1.01 states that the Contracts "shall continue and remain in full force and effect through December 31, 2004, unless otherwise extended by the parties hereto or unless terminated in accordance with the terms hereof." Sections 9.03 and 9.04 define the "termination rights" of the parties as the right to terminate by providing written notice to the other party in the event of a default. These sections unequivocally limit when and how termination could occur. It is undisputed that Swift did not exercise its termination rights under the Contracts. Rather, the Contracts expired on December 31, 2004. Thus, Section 6.02, which applies only at the "termination" of the Contracts, does not apply.

Moreover, Swift's reliance on Carvel Corp. v. Eisenberg, 692 F. Supp. 182 (S.D.N.Y. 1998) and Illinois Bell Telephone Co. v. Donnelley Corp., 595 F. Supp. 1192 (N.D. Ill. 1984) is unavailing. Carvel involved a license agreement that contained a non-compete provision prohibiting the licensees from engaging in certain business activities "in the event this License is terminated for any reason." 692 F. Supp. at 184. The agreement also stated that the non-compete provision survived "termination, abandonment, or other cancellation" of the agreement. Id. After the agreement expired, the licensees continued to operate the store. The licensor sued to enjoin the licensees, arguing that the agreement had terminated by

expiration and thus the licensees were restricted from operating the store.  The licensees argued that they were not restricted because the agreement had only expired and had not been terminated by an action of a party.   Id.

The court concluded that the parties intended the non-compete provision to apply in the event of termination by expiration as well as by any other form of termination.  Id.  The court further emphasized that the purpose of the provision was to protect the licensor's trademark and trade secrets once the license relationship had been severed.  Id. at 185.  Thus, there was no reason to conclude that the parties intended to provide the licensor with less protection from competition in the event of termination by expiration than in the event of some earlier termination of the license agreement.  Id.

Carvel is unpersuasive for two reasons.  First, Carvel is factually distinguishable, since the agreement in that case contained a clause that required the licensees to discontinue use of the licensor's name and trademark upon "expiration or any earlier termination" of the agreement.  Id. at 185.  The Carvel court relied on this provision to infer that the parties understood "expiration" to be a form of "termination."  Id.  There is no such provision in the Contracts at issue.  Second, Defendants aver that payment of the adjustment accounts was meant to be a penalty if Defendants defaulted and Swift terminated the Contracts before the contract term expired.  Thus, there is a basis for determining that the parties understood that the adjustment account balances would disappear at the expiration of the Contracts.  Carvel provides little help to Swift.

17

Illinois Bell Telephone provides even less assistance.  In that case, the court found that the plain and ordinary meaning of the phrase "upon termination" "is at termination, or at the end, or when the contract ends."  595 F. Supp. at 1197.  However, the contract in Illinois Bell Telephone required the defendant to assign all un-expired contracts to the plaintiff if termination occurred.  Id. at 1196; see also id. at 1199-1200 (requiring the defendant to turn over "all unexpired" contracts on the termination date). Moreover, the specific performance the plaintiff sought included immediate assignment of all unexpired contracts to the plaintiff. Id. at 1195.  This indicates that the parties contemplated a difference between termination and expiration.

Moreover, the Illinois Bell Telephone court merely determined that "upon termination" meant when the contract ends and not when a party gives notice of its intent to terminate.  Id. at 1197.  Indeed, the court expressly distinguished between the "natural expiration of the contract" and a "termination date."  Id. at 1198; see also id. (noting that the plaintiff used "the device of the notice to terminate a little over a month before expiration"). Thus, Illinois Bell Telephone actually supports the distinction between contract termination and contract expiration.[5]

---

[5] In addition, at least one Minnesota court has distinguished between contract interpretation and contract expiration.  See Upper Midwest Sales Co. v. EcoLab, Inc., 577 N.W.2d 236, 243 (Minn. Ct. App. 1998) (rejecting a Minnesota Franchise Act claim because the statute referred to "termination during their term of the contract, . . . which is not the situation in this case [because] the agreements expired by their own terms."); see also In re Morgan, 181 B.R. 579, 583-84 (N.D. Ala. 1994) (explaining the difference between "expiration" and "termination" of a contract).  These decisions highlight the distinction between contract expiration and contract termination.

The Contracts, interpreted as a whole, unequivocally limited "termination" to affirmative acts by one party, precipitated by the other party's default.   Section 6.02 only applied after the Contracts were terminated.  It is undisputed that no party exercised its termination rights under the Contracts.  Consequently, Section 6.02 does not apply.  The Court grants Defendants summary judgment on Swift's breach of contract claims.

**C.**   **Swift's Unjust Enrichment Claims**

Swift asserts an unjust enrichment claim against each Defendant.   Defendants argue that the claims fail as a matter of law because the rights of the parties are governed by the Contracts.  "Equitable relief cannot be granted where the rights of the parties are governed by a valid contract." In re Air Transp. Excise Tax Litig., 37 F. Supp. 2d 1133, 1143 (D. Minn. 1999) (citing U.S. Fire Ins. Co. v. Minn. State Zoological Bd., 307 N.W.2d 490, 497 (Minn. 1981).  Thus, where the rights of the parties are governed by a valid contract, a claim for unjust enrichment must fail. N.W. Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1392 n. 4 (8th Cir. 1997) (citing Sharp v. Laubersheimer, 347 N.W.2d 268, 271 (Minn. 1984)); Colangelo v. Norwest Mortg., Inc., 598 N.W.2d 14, 19 (Minn. Ct. App. 1999). Because unjust enrichment claims concern the same subject matter raised in the breach of contract claims, the Court grants summary judgment to Defendants on Swift's unjust enrichment claims.

**D.**   **Swift's Account Stated Claims**

Defendants move for summary judgment on Swift's account stated claims.   "An account stated is a manifestation of assent by a debtor and creditor to a stated sum as an

accurate computation of an amount due the creditor." <u>Am. Druggists Ins. v. Thompson Lumber Co.</u>, 349 N.W.2d 569, 573 (Minn. Ct. App. 1984). "A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent." <u>Id.</u> (citing Restatement (2d) Contracts § 282(1) (1981); <u>Meagher v. Kavli</u>, 88 N.W.2d 871, 879 (1958)). Undisputed evidence shows that Defendants seasonably disputed the amount they owed under the Contracts. Thus, the Court grants Defendants summary judgment on the account stated claims.

**E.     Defendants' Breach of Contract Claims**

Defendants assert that Swift breached the Contracts by unilaterally modifying the pricing formula from live weight to carcass weight. Both parties move for summary judgment on the breach of contract claims. Swift submits that the changes were made pursuant to the provision that defined Market Price as "the daily bulk top plant-delivered price per live cwt. . . . as reported by the U.S.D.A. Market News Service . . . or any replacement thereof or successor thereto." (Corey-Edstrom Aff. Exs. 1-3 § 6.01.) Because the USDA live weight price report was not available after March 1, 1999, Swift had to adjust the price paid under the Contracts.

Swift presents expert testimony that Swift made reasonable efforts to address the change in the USDA daily price report from a live weight report to a carcass weight report, and that the changes resulted in prices that were at least equal to or higher than the prices under the original live weight contract prices. Defendants do not present contrary expert testimony. Instead, they argue that the expert report is inconclusive because the expert could

not opine with exact certainty due to the lack of evidence in the hog markets and USDA reports.  Neither Federal Rule of Evidence 702 nor <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and its progeny require that an expert opinion "resolve an ultimate issue of fact to a scientific absolute in order to be admissible."  <u>Bonner v. ISP Techs., Inc.</u>, 259 F.3d 924, 929 (8th Cir. 2001) (citations omitted).  Rather, the relevant inquiry is whether the evidence is sufficiently reliable and relevant to assist the jury's determination of a disputed issue.  <u>Id.</u> (citations omitted).  Defendants' challenges go to the weight of the expert's testimony—not the admissibility.  <u>Clark v. Hendrick</u>, 150 F.3d 912, 915 (8th Cir. 1998) (courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility); <u>see</u> <u>also</u> <u>Arcoren v. United States</u>, 929 F.2d 1235, 1239 (8th Cir. 1991) (noting that Rule 702 clearly "is one of admissibility rather than exclusion").  Thus, their argument on this point fails.[6]

---

[6] Defendants also contend that Swift admitted that the Contracts could be modified only by a written agreement and that Swift should have paid an amount to Defendants.  They base their contention on Swift's failure to respond timely to their requests for admissions and therefore ask the Court to deem the requests admitted.  Generally, a matter is admitted unless the party responding to the request for admissions serves a written answer or objection within thirty days.  Fed. R. Civ. P. 36(a).  However, the Court "may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits."  Fed. R. Civ. P. 36(b).  "It does not further the interests of justice to automatically determine all the issues in a lawsuit and enter summary judgment against a party because a deadline is missed." <u>American Petro, Inc. v. Shurtleff</u>, 159 F.R.D. 35, 36-37 (D. Minn. 1994) (Erickson, Chief Mag. J.) (citation omitted).  Moreover, Defendants have failed to point to any way in which they were prejudiced by the untimely responses.  Thus, the untimely responses do not warrant the draconian measure that Defendants suggest.

The Contracts linked the prices to the USDA Market News Service "or any replacement thereof or successor thereto."  The record shows that Swift modified the price structure only after the USDA ceased issuing the live weight reports on which the parties initially relied.   Although the conversion from live weight prices to carcass weight prices was not precise, Defendants present no evidence that the modifications were unreasonable. Moreover, Swift continued to modified the price structure to benefit Defendants, and undisputed expert testimony states that those modifications resulted in higher prices to Defendants over the term of the Contracts.   Accordingly, the Court grants Swift summary judgment on Defendants' breach of contract claims.

## F.    Defendants' Minnesota Prevention of Consumer Fraud Act Claims

Defendants argue that Swift violated the Minnesota Prevention of Consumer Fraud Act, Minnesota Statute § 325F.69, in two ways.  First, when Swift notified Defendants that it was unilaterally changing the pricing scheme under the Contracts, Swift quoted the calculation for pricing as "the daily plant-delivered price per live cwt."   The original Contracts defined Market Price as based on the "daily bulk top plant-delivered price per live cwt."  Defendants surmise that Swift omitted the "top" term because it wished to mislead Defendants into believing their Contract prices were lower so that the new weighted average price would seem similar to the original contract price.  Second, Defendants argue that Swift hid from Defendants the fact that it offered a different type of contract to other hog producers—a contract that did not carry an adjustment account.

Defendants do not have standing to bring their § 325F.69 claims.  To bring a cause of action under § 325F.69, Defendants must satisfy the requirements of the Private Attorney General Statute, Minnesota Statute § 8.31.  <u>Davis v. U.S. Bancorp</u>, 383 F.3d 761, 767-68 (8th Cir. 2004).  Specifically, Defendants must show that their claims benefit the public.  <u>Id.</u> at 768.  "Litigation over an alleged misrepresentation that was made only to one person does not advance state interests and enforcement has no public benefit." <u>Id.</u> (citations and internal quotations omitted).  The Contracts were executed during one-on-one business transactions. Moreover, Defendants seek compensatory damages—remedies for their exclusive benefit. Thus, the Court grants Swift summary judgment on the § 325F.69 claims.

## G.    Defendants' Unjust Enrichment Claims

Defendants assert unjust enrichment counterclaims against Swift.  However, like the unjust enrichment claims by Swift, the counterclaims are based on rights governed by the Contracts.  Thus, the Court grants summary judgment to Swift on the unjust enrichment counterclaims.  <u>N.W. Airlines, Inc.</u>, 111 F.3d at 1392 n.4 (citing <u>Sharp</u>, 347 N.W.2d at 271); <u>Colangelo</u>, 598 N.W.2d at 19.

## CONCLUSION

For the foregoing reasons, and based upon all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion for Summary Judgment (Docket No. 32 in Civil No. 05-2775) is **GRANTED in part** and **DENIED in part**;

2.     Defendant Elias Farm's Motion for Summary Judgment (Docket No. 27 in Civil No. 05-2775) is **GRANTED in part** and **DENIED in part**;

3.     Defendant Stan Turbes's Motion for Summary Judgment (Docket No. 26 in Civil No. 05-2776) is **GRANTED in part** and **DENIED in part**;

4.     Defendant William H. Johnson's Motion for Summary Judgment (Docket No. 26 in Civil No. 05-2777) is **GRANTED in part** and **DENIED in part**; and

5.     All claims and counterclaims asserted in these cases are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: May 9, 2007

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge